J-S05030-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.L.C-W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.H., BIRTH MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1454 WDA 2017 |

Appeal from the Order September 18, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  No. CP-02-AP-117-2017

BEFORE:   OLSON, J., OTT, J., and STRASSBURGER[*], J.

MEMORANDUM BY OTT, J.:                              **FILED MARCH 29, 2018**

E.H. ("Mother") appeals from the September 18, 2017 order in the Court of Common Pleas of Allegheny County involuntarily terminating her parental rights to her son, R.L.C.-W. ("Child"), born in February of 2016.[1]  Upon careful review, we affirm.[2]

In its opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), the orphans' court set forth the factual and procedural history of this

———————————————————————

[*] Retired Senior Judge assigned to the Superior Court.

[1] The order also involuntarily terminated the parental rights of any unknown father, and putative fathers, T.V. and P. unknown.  Neither any unknown father nor the putative fathers filed a notice of appeal.

[2] Child was represented by counsel during the subject proceedings.  Child's counsel has filed an appellee brief to this Court in support of the involuntary termination order.

case, which the testimonial evidence supports. As such, we adopt it herein. *See* Trial Court Opinion, 10/27/17, at 2-7.

By way of background, Child was born prematurely at 31 weeks gestation. He weighed one and a half pounds. *Id.* at 2. Child remained in the neonatal intensive care unit in the hospital for two months. *Id.* at 3. He was placed in shelter care on April 6, 2016, due, in part, to Mother failing to avail herself of training on Child's medical needs before he was discharged from the hospital; lacking stable housing; reporting drug and alcohol use; and having an intellectual disability.[3] *Id.* at 3, 5 (citations to record omitted). Child was adjudicated dependent on April 21, 2016. *Id.* Since May of 2016, Child has resided with his foster parents, who are a pre-adoptive resource. *Id.* at 65.

The Allegheny County Office of Children, Youth and Families ("CYF") established Child's placement goal as reunification. Mother was required to satisfy the following family service plan ("FSP") goals, in relevant part: attend random drug screens; cooperate with services; attend all of Child's medical appointments; participate in supervised visits with Child; enroll in a dual diagnosis program; participate in an evaluation through the Office of Intellectual Disabilities; and secure stable housing. *Id.* at 4.

---

[3] The record reveals that Mother possesses an I.Q. of 69, which is in the "mild range" of intellectual disability. N.T., 9/18/17, at 107.

On July 14, 2017, CYF filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). A hearing occurred on September 18, 2017, at which time Child was approximately nineteen months old. CYF presented the testimony of the following witnesses: Colleen Sokira, in-home manager for the parenting education program at ACHIEVA;[4] Kris Kisiday, CYF caseworker; and Neil D. Rosenblum, Ph.D., via telephone, who performed on June 12, 2017, an individual evaluation of Mother;[5] an interactional evaluation of Child with Mother; and an interactional evaluation of Child with his foster parents. Mother testified, via telephone, on her own behalf.

The testimonial evidence reveals that Child suffers from a feeding disorder that makes him feel full all the time. N.T., 9/18/17, at 88, 148. Child has a gastrostomy tube ("G tube"), and he receives his nutrition through it. *Id.* at 88-89. By the time of the hearing, he was starting to eat food. *Id.* at 149. Child receives occupational therapy as well as, on a monthly basis, "feeding therapy." *Id.* In addition, Child suffers from developmental delays. *Id.* at 90.

---

[4] The orphans' court stated that ACHIEVA "is a nonprofit parent organization that has comprehensive services and supports and serves thousands of individuals with disabilities and their families each year." Trial Court Opinion, 10/27/17, at 4 n. 6.

[5] Dr. Rosenblum diagnosed Mother with intellectual disability, mild cannibis use disorder; unspecified bipolar and related disorder; and unspecified anxiety disorder. N.T., 9/18/17, at 109.

By order dated September 18, 2017, the orphans' court involuntarily terminated Mother's parental rights. Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on October 27, 2017.

On appeal, Mother raises the following issue for our review:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's brief at 6.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for

- 4 -

termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, the orphans' court terminated Mother's parental rights pursuant to the following relevant provisions.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (5), (8), (b).

Mother does not challenge the termination order pursuant to Section 2511(a). Mother's sole challenge relates to Section 2511(b). This Court has explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on

the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted). We have further explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

In addition, our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and

we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Mother argues that the evidence was insufficient to terminate her parental rights pursuant to Section 2511(b). Specifically, she argues that there was evidence of a "positive bond" between her and Child. Mother's brief at 16. Mother asserts that she loves Child, and that Child enjoys being with her. ***Id.*** at 17. She also asserts that there was no evidence of "risk or detriment" to Child if her parental rights "remained intact." ***Id.*** at 16. We disagree.

The orphans' court determined that "no emotional bond exists [between Mother and Child] to the extent that the termination of parental rights of Mother would cause Child to suffer extreme emotional consequences." Trial Court Opinion, 10/27/17, at 8 (citation omitted). The court relied on the testimony of Dr. Rosenblum.

Dr. Rosenblum testified that there is "[s]ome degree of attachment" of Child to Mother; however, Dr. Rosenblum explained that Child's relationship with Mother is not his primary attachment because he is not "dependent in any way on Mother to meet his needs." N.T., 9/18/17, at 93-94. In contrast, Dr. Rosenblum testified that Child "has formed a very strong and primary attachment to [his] foster parents." ***Id.*** at 90. As such, he opined there

would be no detriment to Child should Mother's parental rights be terminated. *Id.* at 99.

With respect to Child's physical needs, Dr. Rosenblum opined that, based on his interactional evaluation of Child with Mother, "Mother does not seem to understand the feeding process. She is aware that he is fitted with a G tube. . . ." *Id.* at 91-92. He provided the following example during direct examination.

> [E]arly in the session [regarding the interactional evaluation between Child and Mother], . . . it was noted that [M]other inappropriately gave [Child] a piece of her granola bar that she was eating which he immediately spit out. She said that in her opinion, he should be able to eat these types of foods when, quite clearly, he is not capable of eating those types of foods[. . . .] I believe it has been raised before with [M]other that she should not be giving him . . . anything that would be very difficult clearly for him to digest as even pureed food is a challenge for [Child].

*Id.* at 91. He continued:

> [Mother] hasn't used the feeding tube yet, . . . I think in part obviously because she only has visits twice a week and she does feed him . . . give him his formula during those visits. Mother seems to be under the impression that [Child] took about five ounces of formula when clearly, foster parents had indicated that he usually can only take about two [ounces of formula]. So [M]other seemed to be somewhat inconsistent and, in my opinion, lax about her understanding of [Child's] nutritional needs.

*Id.* at 92.

Importantly, Dr. Rosenblum testified that Mother has difficulty exercising independent judgment, and this "could be at the core of her difficulties with being able to understand [Child's] needs, to recognize what

courses of action would have a positive versus a negative outcome." *Id.* at

107-108. In conclusion, he opined as follows.

> Q. [D]oes the fact that [Child] has special needs, does that factor
> in your opinion of [Mother's] ability to care for [Child]?
>
> A. Yes. Without a doubt. . . . I would say her intellectual
> disabilities . . . clearly would interfere with her ability to provide
> suitable care for [Child], to understand his complex medical
> needs, to follow guidelines regarding nutrition, food intake, her
> ability to understand any complications or problems that she
> would have and that he would have and even problems in
> administering proper nutrition with the feeding tube I would say
> would be extremely challenging for [M]other.
>
> So I would say yes, that the combination of her intellectual
> ability and his special needs . . . would make it particularly
> challenging and significantly interfere with her ability to provide
> suitable care.

*Id.* at 96-97.

In addition, Ms. Sokira, the caseworker for the parenting education

program at ACHIEVA, testified that Mother has an inability to provide for

Child's safety. She explained, "[A] lot of [the safety issues] come[] from her

intellectual disability and her inability to think ahead of – think of those next

steps. . . ." *Id.* at 13. For instance, Ms. Sokira testified:

> [Mother] didn't stop [Child] from eating because she didn't realize
> overfeeding would hurt him. She didn't stop him from running
> down the hallway because if she didn't see him go around the
> corner, she didn't know what would happen to him. She didn't
> hold his hand because she didn't realize someone else could grab
> his hand and walk away with him. She didn't have the forethought
> of what could happen to him.

*Id.*

Based on the foregoing testimonial evidence, we conclude that the orphans' court did not abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(b). To the extent Mother asserts that the court's decision is based on the foster parents "allowing Mother to have ongoing contact" with Child, an outcome that is not guaranteed, Mother's assertion is not supported by the testimonial evidence or the court's Rule 1925(a) opinion.[6] Mother's brief at 12. Rather, as discussed *supra*, the court determined terminating Mother's rights will not cause Child to suffer extreme emotional consequences. Further, the court found, "the uncontroverted testimony established that Child's needs are best met with the [f]oster [p]arents. Child's primary bond is with the [f]oster [p]arents because Child has been living with them for a year and a half[,] and he relies on them to be his primary caregivers. The [f]oster [p]arents provide Child with much needed stability and permanence at his young age." Trial Court Opinion, 10/27/17, at 11. We agree. Accordingly, we affirm the involuntary termination order.

Order affirmed.

---

[6] We attribute Mother's bald assertion to the testimony of Chelsea Jacobs, the foster care caseworker, who testified at the permanency review hearing subsequent to the involuntary termination proceeding with respect to Child's permanency plan. *See* N.T., 9/18/17, at 146-152. Upon inquiry by the court, Ms. Jacobs testified that the foster parents would likely be willing to transport Child for post-termination supervised visits with Mother at the inpatient drug and alcohol facility where she was then residing. *Id.* at 146-147.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/29/2018